UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DONALD R. RYAN, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) No. 4:08-CV-1697 (CEJ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration (SSA).

## I. Procedural History

On February 24, 2006, plaintiff Donald R. Ryan filed an application for supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of February 17, 1991. (Tr. 13).[1] After plaintiff's application was denied on initial consideration (Tr. 62-66), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 69).

The hearing was held on July 12, 2007. Plaintiff was represented by counsel. (Tr. 18-57). The ALJ issued a decision on September 8, 2007. (Tr. 10-17). The Appeals Council denied plaintiff's request for review on October 9, 2008. (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

---

[1] Plaintiff "previously filed an application for [SSI] benefits on December 20, 2004, which was denied initially on March 25, 2005, and the claim was not further pursued." (Tr. 13).

At the time of the hearing, plaintiff was 36 years old.[2] (Tr. 22). Plaintiff testified that he had not had driver's license in 10 years, (Tr. 23), and that he lived in his parents' garage. (Tr. 31). Plaintiff's parents allowed him to access the basement to use the bathroom. (Tr. 33). Plaintiff testified that he took a bath two or three times a week, and that he performed no household chores. (Tr. 33-34). During the day, plaintiff "[sat] on the wall in [the] alley and wave[d] at the cars[.]" (Tr. 40).

Plaintiff testified that he could dress himself. (Tr. 31). Plaintiff stated that his thirty-nine year old brother Sam helped him pay bills. (Tr. 35, 37). Plaintiff could not balance a checkbook. Id. Plaintiff did not read books or magazines because he could only read three-letter words. (Tr. 36). However, plaintiff watched cartoons and the local news on television. (Tr. 36). Plaintiff testified that he would need help at the grocery store because he "[did not] know how to use the food card yet." (Tr. 37).

Plaintiff completed special education classes in the tenth grade, but he never earned his GED. (Tr. 24). Plaintiff had not worked in "10, 12, 13, or 14 years." Id. Plaintiff stated that was not taking any medications, and that he had just received his "Medicaid card not too long ago." Id. Plaintiff had not seen a psychiatrist or psychologist. (Tr. 32). Plaintiff testified that he received food stamps, and that he "had never been married, [had] no kids," [and] no girlfriend." (Tr. 30-31). Plaintiff testified that he had one friend who visited him once a month. (Tr. 38).

In response to his attorney's inquiry as to why the consultative exam report indicated that he drove to one of his consultative exams, plaintiff testified his brother drove him to the examination site. (Tr. 25-26). Plaintiff stated that he sometimes

---

[2]The ALJ conducted the hearing on July 12, 2007, and the next day was plaintiff's birthday. (Tr. 20, 22).

walked three blocks to the 7-Eleven store, and that he did not ride the bus because he had gotten lost in the past. (Tr. 27).

Plaintiff testified that he had held "a lot of jobs," and that he worked in janitorial positions, which involved "sweeping [and] simple stuff." Id. Plaintiff had no idea why his former employers fired him. (Tr. 28). Plaintiff testified that he had quit jobs because he "felt stupid" and "didn't feel like [he] needed to be around people . . . that didn't really understand [him.]" Id.

Plaintiff testified that, in 1991, he was hit in the head with a bat. (Tr. 29). As a result, he suffered hearing loss in his right ear. Id. Plaintiff claimed that he has twenty percent hearing in his right ear. (Tr. 30). Plaintiff testified that he took Tylenol for his occasional day-long headaches, and that he was not under the supervision of a doctor or specialist. (Tr. 42). Plaintiff stated that he did not take any medication because he did not "want to be . . . more messed up than [he was]." (Tr. 24).

After he fell on a bottle in an alley, plaintiff suffered a left-hand injury that occasionally caused numbness in two fingers. (Tr. 42-44). Plaintiff testified that he would not permit a doctor "to . . . cut [his] hand back open just to try to get the feeling back." (Tr. 44). Because of his injury, plaintiff claimed that he could only lift seven to eight pounds with his left hand. (Tr. 45).

In response to the ALJ's inquiry as to whether he had been incarcerated, plaintiff testified that ten years earlier he served one or two days in jail for driving while intoxicated. (Tr. 46).

Brenda Young, the vocational expert (VE), testified that plaintiff's past work "as a bellhop would have been unskilled and medium and the cleaning positions were unskilled and ranged from light to medium." (Tr. 47). The VE further stated that

plaintiff had worked as a grocery bagger, and that such job was an unskilled position with light duty. Id.

The ALJ then asked the VE about the employment opportunities for an individual with the ability to carry out simple instructions and directions in a routine work environment; with minimal background noise; the need for people to give instructions on his left side due to significant right-sided hearing loss; and with occasional contact with the public or co-workers. (Tr. 47). The VE testified that such an individual would be able to perform janitorial work. (Tr. 47- 48). The VE stated that her assessment was "consistent with the Dictionary of Occupational Titles and the Selected Characteristics of Occupation[.]" (Tr. 48).

Upon cross-examination by plaintiff's attorney, the VE testified that plaintiff's past janitorial work required minimal supervision. Id. The VE stated that an individual with an IQ of 72 could perform "that kind of simple, repetitive work." Id. Plaintiff's attorney stated that "Allison Breuner[,] who is a consultative examiner[,] opined that [plaintiff had] a significant cognitive deficiency," and asked the VE whether such deficiency would affect plaintiff's ability to perform janitorial work. (Tr. 48). The ALJ instructed plaintiff's attorney to rephrase his hypothetical "in vocational terms." (Tr. 49). The VE then testified that she had read Ms. Breuner's report. Id. Plaintiff's attorney asked the VE whether "there [was] anything in the report that [she thought] would impact [plaintiff]'s ability to obtain or maintain employment[.]" (Tr. 51). Although the ALJ believed that the question was "completely beyond the scope of [the ALJ's] examination and completely beyond the scope of her function," the ALJ permitted the VE to answer, and the VE provided the following testimony:

> Well, I would indicate from the diagnosis and recommendations [that] there are IQ scores in the body of the file. It indicates that the person would need to obtain suitable work for his intellectual functioning, for

example, manual labor and non-complex employment which would be consistent with janitorial type of work.

(Tr. 51).

The VE also testified that "[i]t appeared from the years that were indicated on the vocational file that [plaintiff engaged in significant gainful activity] . . . from 1989 to 1994." (Tr. 51-52). In her opinion, part-time janitorial work "could be past relevant work [for plaintiff.]" (Tr. 52). The VE explained that an employer would not have to make any accommodations for an individual with a left ear hearing loss. Id. Rather, the individual would make the accommodation by "turn[ing his or her] good ear toward [the] person." Id.

Plaintiff's attorney then stated that the Disability Determination Services (DDS) form listed the four moderate limitations: (1) remember detailed instructions; (2) carry out detailed instructions moderately limited; (3) interact with the public moderately limited; and (4) the ability to get along with co-workers without distracting them or exhibiting behavioral extremes. (Tr. 52-53). Plaintiff's attorney asked the VE whether "those multiple moderates" would impact a [c]laimant's ability to obtain or maintain employment[.]" (Tr. 53). Because the DDS form did not define the term "moderate," the ALJ stated that it was inappropriate for plaintiff's attorney to use this term. Id. The VE stated that she was unaware if the SSA defined the term. (Tr. 54).

The VE then testified that an individual's "inability to do math or read at . . . a third or fourth grade level [would not] affect [his or her] ability to do janitorial work[.]" Id. Despite his head injury in 1991, the VE stated that plaintiff's vocational form "showed that he [performed janitorial work] up until 1994.]" (Tr. 54-55).

The ALJ then modified his first hypothetical to include an individual of plaintiff's age, education, and work experience. (Tr. 55). The VE testified that such an

individual could also perform janitorial work, and that 14,000 janitorial-type jobs were available in the St. Louis area. (Tr. 56). Finally, the VE stated that her "additional testimony . . . given [was] consistent with the Dictionary of Occupational Titles and the Selected Characteristics of Occupation[.]" Id.

A Third-Party Function Report was completed by plaintiff's mother, Rosalee Ann Ryan, on July 8, 2006. (Tr. 118-25). Ms. Ryan indicated that plaintiff did not handle changes in routine well. (Tr. 119). Ms. Ryan identified plaintiff's disabling conditions as lifting, hearing, memory, using his hands, completing tasks, understanding, following instructions, and getting along with others. (Tr. 120). She also stated that plaintiff could lift two pounds, walk two blocks, and could pay attention for only three minutes. Id. Ms. Ryan indicated that plaintiff was "very very bad" at following written instructions, such as recipes, understanding spoken instructions, and getting along with authority figures, such as police, bosses, landlords, or teachers. Id. Ms. Ryan also noted that plaintiff had no hobbies or interests, did not spend time with others, and was unable to pay bills, count change, handle a savings account, or use checkbooks and money orders. (Tr. 121-22). According to Ms. Ryan, plaintiff could not prepare his own meals, and plaintiff's depression affected his sleep. (Tr. 123-24).

### III. Medical Evidence

On February 18, 2005, Alison Burner, M.A., a psychologist, administered the Wechsler Adult Intelligence Scale-III (WAIS-III). (Tr. 169-71). Plaintiff obtained a full scale IQ score of 72, a verbal IQ score of 74, an a performance IQ score of 74. (Tr. 170). Ms. Burner provided the following diagnosis and recommendation:

> This testing is considered a valid estimate of Mr. Ryan's actual abilities.
> . . .

> This testing is considered a valid assessment of actual intellectual functioning. There is evidence of significant cognitive deficiency as [plaintiff's] ability falls within the Borderline range.
>
> Given his cognitive profile, [plaintiff] should be able to obtain employment in line with his intellectual functioning. He would be best suited to manual labor or non complex [sic] employment situations.
>
> At this time, there does appear to be a cognitive deficiency which would negatively affect obtaining and maintaining employment.

(Tr. 171).

On March 2, 2005, Carl F. Ehrlich, M.D., conducted hearing tests on plaintiff.

(Tr. 172-73). Dr. Ehrlich reported that:

> An audiogram . . . showed a profound right-sided neurosensory hearing loss with essentially normal hearing in his left ear, perhaps slightly below normal limits, but 100% discrimination score on the left and only 4% on the right. . . .
>
> Unilateral profound right deafness secondary to head trauma. The left ear has mild decrease in hearing with normal discrimination score. He has a nasal septal performation, exact etiology unknown. This gentleman could work in an environment where he would be able to face whatever conversational speech was required with good left ear and there would need to be minimal noise in the background so as not to distract him from hearing. I do not think a hearing aid will be of any help in his right ear.

(Tr. 173).

On March 25, 2005, Judith A. McGee, Ph.D., a psychologist, completed consultative psychiatric examination and residual functioning capacity (RFC) assessment of plaintiff. (Tr. 151-60, 161-67). Dr. McGee concluded that plaintiff experienced mild restrictions in terms of daily living, and moderate difficulty in social functioning and maintenance of concentration, persistence, and pace. (Tr. 161). Dr. McGee also noted that plaintiff retained the ability to (1) ask and understand simple questions; (2) follow and carry out simple instructions; (3) perform at least simple unskilled work. (Tr. 166). "Due to [plaintiff] stating [that] he [did] not socialize or

have friends, [Dr. McGee reported that] he would be most beneficial with minimal social contact." Id.

On April 27, 2006, Elbert H. Cason, M.D., completed a consultative general medical examination of plaintiff. (Tr. 185-90). Dr. Cason noted that plaintiff had suffered head injuries at ages 12 and 21, hearing loss, and a left-hand injury. (Tr. 185). Dr. Cason made the following observations:

> [Plaintiff] could heel and toe stand and squat. His gait [was] normal without the use of any assistive devices. Back motion was normal. Straight leg raises were normal. Major muscle group strengths of the lower extremities were normal. Cervical spine motions were normal. Ankle motions were normal. The knee motions were normal. The wrist motions were normal and the grip strengths were normal. He could use his fingers for buttoning, writing, using small tools or parts. Elbow motions were normal and the shoulder motions were normal. The remainder of the musculoskeletal examination was unremarkable.

(Tr. 187).

On May 24, 2006, Arthur C. Littleton, Ph.D., a licensed psychologist, performed a consultative psychological evaluation of plaintiff. (Tr. 192-94). Plaintiff "stated that he [was] frequently called 'stupid' and often [found] himself feeling sad and depressed." (Tr. 193). Plaintiff claimed that "he generally [kept] to himself because of his difficulty in getting along with others." Id. Dr. Littleton diagnosed plaintiff with adjustment disorder with a depressed mood and anxiety, borderline intellect, head trauma and hearing loss, and educational, psychological and occupational problems. (Tr. 194). Additionally, Dr. Littleton assigned plaintiff a Global Assessment of Functioning (GAF) score of 60.[3] Id.

---

[3]The GAF score of 51 to 60 applies when a claimant has "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. text rev. 2000).

On June 8, 2006, Dr. McGee performed another consultative psychiatric examination and RFC assessment of plaintiff. (Tr. 195-210). Dr. McGee noted that plaintiff "retain[ed] the ability to perform simple work-related tasks with limited social interactions." (Tr. 196). Dr. McGee again concluded that plaintiff experienced mild restrictions in daily living, and moderate limitations in social functioning and maintenance of concentration, persistence, and pace. (Tr. 208).

## IV. The ALJ's Decision

Administrative Law Judge James B. Griffith presided at plaintiff's administrative hearing, and made the following findings:

1. The claimant has not engaged in substantial gainful activity since the application filed on February 24, 2006.

2. The medical evidence establishes that the claimant has borderline intellectual functioning and right ear hearing loss, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in the Appendix 1, Subpart P, Regulations No. 4.

3. Although the claimant has some hearing loss and limitations due to his level of intellectual functioning, the claimant's allegation of disabling severity of limitations is not credible for the reasons enumerated in the decision.

4. The claimant has the residual functional capacity to perform the non-exertional requirements of work involving simple instructions and directions in a routine work environment, with minimal background noise, and no more than minimal contact with the public. There are no exertional limitations.

5. The claimant's impairments and functional limitations do not prevent the claimant from performing his past relevant work as a cleaner.

6. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 17).

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Sec'y of Health and Human Services. 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is

disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

   A.   **Standard of Review**

The Court must affirm the Commissioner's decision, if the decision "is supported by substantial evidence on the record as a whole." Gladden v. Callahan, 139 F.3d 1219, 1222 (8th Cir. 1998), quoting Smith v. Schweiker, 728 F.2d 1158, 1161 (8th Cir. 1984). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). To determine whether the Commissioner's decision is supported by substantial evidence, the Court "must take into account whatever in the record detracts from its weight." Gladden, 139 F.3d at 1222, quoting Smith v. Schweiker, 728 F.2d at 1162. The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

   1.   The ALJ's credibility findings;

   2.   the plaintiff's vocational factors;

   3.   the medical evidence;

   4.   the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

   5.   third-party corroboration of the plaintiff's impairments; and

   6.   when required, VE testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Sec'y of Health & Human Services., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217, citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

B. <u>Analysis</u>

Plaintiff's administrative appeal raises four allegations of error by the ALJ: (1) failing to consider Listing 12.05C; (2) improperly relying on the VE's testimony in determining plaintiff's past relevant work; (3) prohibiting plaintiff's attorney from adequately cross-examining the VE; and (4) failing to consider the third-party evidence.

1. *The ALJ's Listing Determination*

To satisfy Listing 12.05C, 20 C.F.R. 404, App. 1 to Subpt. P, (entitled "Mental Retardation"), "a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006). "For a claimant to show that his unlisted impairment [medically equals] a listing, it must meet *all* of the specified medical criteria." Marciniak v. Shalala, 49 F.3d 1350, 1353 (1995) (emphasis in original) (quoting Sullivan v. Zebley, 493 U.S. 521, 530 (1990)); see also C.F.R. § 416.926(a) (claimant's "impairment(s) is medically equivalent to a listed impairment in appendix 1 of subpart P of part 404 . . . if it is at least equal in severity and duration to the criteria of any listed impairment."). The claimant "must present medical findings equal in severity to *all* the criteria for the one most similar

listed impairment." Marciniak, 49 F.3d at 1353 (quoting Zebley, 493 U.S. at 531, and citing 20 C.F.R. § 404.1526).

The ALJ determined that plaintiff "[had] not engaged in substantial gainful activity since [his] application [was] filed [on] February 25, 2006[, and that the] medical evidence establishes that [plaintiff had] borderline intellectual function and right ear hearing loss which limit[ed] his ability to perform work-related activities." (Tr. 14). The ALJ noted that plaintiff underwent the WAIS-III exam, and that he "achieved a verbal IQ score of 74, a performance IQ score of 74, and a full scale IQ score of 72, placing him within the borderline range of intellectual functioning." (Tr. 14). The ALJ concluded that "[t]he medical evidence establishe[d] that [plaintiff did] not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4." (Tr. 17).

Plaintiff first argues that the ALJ erred by failing to cite or mention Listing 12.05C. This contention is without merit. In Karlix v. Barnhart, "[t]he ALJ stated that there was no evidence that [the claimant]'s impairment met or equaled any of the impairments listed in Appendix 1 to 20 C.F.R. Part 404." 457 F.3d 742, 745 (8th Cir. 2006). Although the ALJ in that case failed to mention a specific listing, the Eighth Circuit found that "the ALJ did consider evidence of a list impairments and concluded that there was 'no showing on [the] record that the claimant's impairments, whether considered singly on in combination, [met] or [was] equivalent to any of the listed impairments.'" Id. As such, the Eighth Circuit held that "[t]he fact that the ALJ did not elaborate on this conclusion [did] not require reversal, because the record support[ed the ALJ's] overall conclusion." Karlix, 457 F.3d at 745 (citing Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003), and quoting Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 n.3 (8th Cir. 2005) ("The fact that the ALJ's

decision does not specifically mention the [particular listing] does not affect our review.")).

Plaintiff concedes that his impairments do not meet all of the medical criteria for Listing 12.05C. Instead, plaintiff argues that his combination of impairments are medically equivalent to the criteria set forth in Listing 12.05C. The Eighth Circuit holds that, although "[the SSA's Program Operations Manual System (POMS)[4] does] not have legal force and [does] not bind the Commissioner, the courts should consider [the POM provisions] in their findings." Hartfield v. Barnhart, 384 F.3d 986, 988 (citation omitted). Section DI 24515.056(D)(1) of the POMS provides:

> Listing 12.05C is based on a combination of an IQ score with an additional and significant mental or physical impairment. The criteria for this paragraph are such that a medical equivalence determination would very rarely be required. However, slightly higher IQ's (e.g., 70-75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination. It should be noted that[,] generally higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.

POMS § DI 24215.056(D)(1)(c), *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0424515056!opendocument.

Here, plaintiff's lowest IQ score of 72 falls within the "sightly higher" range. (Tr. 14). Plaintiff testified that he was in special education classes in school, he dropped out in the tenth grade, and that he did not read books or magazines because he could only read three-letter words. (Tr. 13, 24, 36). Furthermore, Dr. Ehrlich diagnosed plaintiff with a hearing impairment, and Ms. Burner opined that plaintiff suffered from borderline intellectual functioning. The ALJ found that, "[b]ased on [plaintiff]'s right ear hearing loss and borderline intellectual functioning, [plaintiff was] restricted to the

---

[4]The POMS are "a set of internal rules" issued by the SSA Commissioner "to aid in [the] determination[]" of disability claims. Hartfield, 384 F.3d at 988.

-14-

performance of work involving simple instructions and directions in a routine work environment with only occasional contact with the public." (Tr. 16).  Because plaintiff's IQ score falls within the slightly higher range, and plaintiff's medical records indicate that he suffered from both a mental and physical impairment that imposed an additional and significant work-related limitation , the ALJ's determination that plaintiff does not have an impairment that medically equals any listing is not supported by substantial evidence on the record.

### 2. *The ALJ's Reliance on the VE's Testimony*

In his second allegation of error, plaintiff contends that the ALJ improperly relied on the testimony from the VE that plaintiff could perform cleaning or janitorial work. Specifically, plaintiff argues that the ALJ failed to resolve the inconsistency between the VE's testimony and the U.S. Department of Labor and Training Administration's Dictionary of Occupational Titles (DOT) (4th ed. rev. 1991).

> [A]n ALJ cannot rely on expert testimony that conflicts with the job classifications in the [DOT] unless there is evidence in the record to rebut those classifications. The [DOT's] are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range. [N]ot all of the jobs in every category have requirements to or as rigorous as those listed in the [DOT].

Hillier v. Soc. Sec. Admin., 486 F.3d 359, 366-67 (8th Cir. 2007) (internal quotations and citations omitted).

At the administrative hearing, the VE testified that plaintiff had worked as a bellhop, which the VE described as "unskilled and medium[.]"  (Tr. 47).  The VE also depicted plaintiff's past "cleaning positions [as] unskilled and [noted that they] ranged from light to medium."  Id.  The ALJ asked the VE what would be the past relevant work for an individual with the capacity to perform simple instructions and directions in a routine work environment with minimal background noise, and no more than

occasional contact with the public. (Tr. 47). The VE testified that such an individual could perform janitorial work. (Tr. 48). The ALJ then modified the first hypothetical to include plaintiff's age, education, and work experience. (Tr. 55). The VE again testified that such a person could perform janitorial work. (Tr. 56). Without citing or mentioning a DOT code, the VE stated that her testimony was consistent with the DOT. (Tr. 48, 56). The record also reveals that, from 1989 to 1994, plaintiff worked as a cleaner in a hotel, sweeping and mopping floors as well as emptying trash cans. (Tr. 109).

> The DOT provides the following description for a janitor:
>
> Keeps hotel, office building, apartment house, or similar building in clean and orderly condition and tends furnace, air-conditioner, and boiler to provide heat, cool air, and hot water for tenants, performing any combination of [the] following duties: Sweeps, mops, scrubs, and vacuums hallways, stairs and office space. Regulates flow of fuel into automatic furnace or shovels coal into hand-fired furnace. Empties tenants' trash and garbage containers. Maintains building, performing minor and routine painting, plumbing, electrical wiring, and other related maintenance activities, using handtools. Replaces air-conditioner filters. Cautions tenants regarding complaints about excessive noise, disorderly conduct, or misuse of property. Notifies management concerning need for major repairs or additions to lighting, heating, and ventilating equipment. Cleans snow and debris from sidewalk. Mows lawn, trims shrubbery, and cultivates flowers, using handtools and power tools. Posts signs to advertise vacancies and shows empty apartments to prospective tenants. May reside on property and designated Manager, Resident (any industry).
>
> *GOE: 05.12.18 STRENGTH: M GED: R3 M2 LS SVP: 3 DLU: 88*

DOT § 382.664-010 (emphasis in original). The italicized acronyms, numbers, and words at the end of the job description further define janitorial work. See DOT, App. C, at 1009. The acronym "GED" stands for "General Education Development," and the "R" refers to "reasoning development." Id. at 1011. The "janitor" description includes a GED at level R3, which the DOT defines as the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic

form[, and to d]eal with problems involving several concrete variables in or from standardized situations." Id.

The ALJ determined that plaintiff's RFC included, *inter alia*, the ability *"to perform simple instructions and directions in a routine work environment*, with minimal background noise, and no more than occasional contact with the public." (Tr. 15) (emphasis added). According to the DOT, an occupation with a GED at level R1 would be able to "[a]pply commonsense understanding to carry out simple one- or two-step instructions[, and to d]eal with standardized situations with occasion or no variables in or from these situations encountered on the job." DOT, App. C, at 1011. The VE testified that plaintiff could perform janitorial work; however, the VE mentioned no DOT citation to support her assessment. Furthermore, the DOT assigned a GED of R3 to the occupation of janitor, which requires an individual with the ability to understand more detailed instructions. Id. at 1011. In his decision, the ALJ did not mention this inconsistency. In fact, the ALJ determined that "[t]he testimony of the vocational expert was consistent with the [DOT] and the Selected Characteristics of Occupations." (Tr. 15). The Court, therefore, finds that substantial evidence on the record does not support the ALJ's reliance on the VE's testimony.

3. *Examination of the VE by Plaintiff's Attorney*

In his third allegation of error, plaintiff contends "that the ALJ improperly limited his ability to question the VE[.]" (Tr. 12). 20 C.F.R. § 404.950 provides, in relevant part:

> (c) What evidence is admissible at a hearing. The administrative law judge may receive evidence at the hearing even though the evidence would not be admissible in court under the rules of evidence used by the court. . . .

> (e) Witnesses at a hearing. . . . The administrative law judge may ask the witnesses any questions material to the issues and shall allow the parties or their designated representatives to do so.

20 C.F.R. § 404.950 (c),(e).

Plaintiff claims that "the ALJ failed to allow counsel to complete [his questioning of] the VE[.]" (Doc. #13, at 13). During the administrative hearing, the ALJ stated that plaintiff's attorney's question was "beyond the scope of [the ALJ's] examination[.]" (Tr. 51). However, the ALJ stated, "I'll let [the VE] answer it, but I don't think this is an appropriate question for this witness." Id. Plaintiff also contends that the ALJ did not permit him to explore the inconsistencies between the VE's testimony and the DOT; however, the transcript indicates the ALJ permitted plaintiff's counsel to question the VE until she "[had] nothing further" to ask. (Tr. 55). The Court, therefore, finds that plaintiff's third contention is without merit.

### 4. Plaintiff's Third-Party Evidence

The ALJ determined that plaintiff retained the RFC "to perform the non-exertional requirements of work involving simple instructions and directions in a routine work environment, with minimal background noise, and no more than minimal contact with the public." (Tr. 17). Plaintiff argues that the ALJ failed to consider the Third-Party Function Report submitted by plaintiff's mother in determining plaintiff's RFC.

The RFC is the most that a claimant can do despite physical or mental limitations. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); 20 C.F.R. § 404.1545. It is the claimant's burden, rather than the Commissioner's, to prove the claimant's RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the

claimant's own description of his limitations. Id. Ultimately, however, the determination of residual functional capacity is a medical issue, Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000), which requires the consideration of supporting evidence from a medical professional, Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

In determining plaintiff's RFC, the ALJ relied upon the consultative medical examinations performed by Ms. Burner, Dr. Littleton, Dr. Ehrlich, and Dr. Cason. The ALJ noted that Ms. Burner "stated, 'Given his cognitive profile, Mr. Ryan should be able to obtain employment in line with his intellectual functioning [, and that he] would be best suited to manual labor or non complex [sic] employment situations.'" (Tr. 14). Dr. Littleton opined that plaintiff suffered from "an adjustment disorder with a depressed mood and anxiety with a Global Assessment of Functioning (GAF) [score] of 60." (Tr. 15). With respect to plaintiff's physical limitations, the ALJ cited Dr. Ehrlich's conclusion that plaintiff "showed a profound right-sided neurosensory hearing loss with essentially normal hearing in his left ear[.]" (Tr. 14). The ALJ also noted that Dr. Ehrlich determined that plaintiff "could work in an environment where he would be able to face whatever conversational speech was required with his good left ear[, but that] there would need to be minimal noise in the background[.]" (Tr. 14-15). The ALJ also considered Dr. Cason's opinion that, despite plaintiff's left-hand injury at age 19, plaintiff had "full motion of the fingers in his left hand[, h]is grip strengths were normal bilaterally [, and his m]usculoskeletal examination was remarkable." (Tr. 15).

Although the ALJ does not specifically mention Ms. Ryan's Third-Party Function Report, the ALJ stated that he "careful[ly] considered the entire record." (Tr. 17). Moreover, the Court concludes the ALJ relied on the relevant medical reports in the record, and that substantial evidence in the record support the ALJ's determination of

plaintiff's RFC. See Roberson v. Astrue, 481 F.3d 1020, 1026 (8th Cir. 2007) ("we do not think that the ALJ was required to refer to every part of the record, and we think that the portions of the record that he referred to were sufficient to support credibility determination.").

## VI. Conclusion

The Court finds that the plaintiff had a full opportunity to examine the VE, and that the ALJ considered all relevant evidence to determine plaintiff's RFC. However, the Court also finds that the Commissioner's decision is not supported by substantial evidence on the record as a whole regarding the ALJ's (1) listing determination or (2) reliance on the VE's testimony.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this case is **remanded** pursuant to sentence 4 of 42 U.S.C. § 405(g) for a hearing to determine whether plaintiff's combination of impairments are medically equal to Listing 12.05C and to resolve the inconsistency between the VE's testimony and the DOT.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 24th day of March, 2010.